David J. Harris, Jr. (SBN 286204)
david@harrisllp.com
Gerilyn R. Harris (SBN 286031)
gerilyn@harrisllp.com
HARRIS LLP
501 West Broadway, Suite 800
San Diego, California 92101
Telephone: (619) 213-1102

*Counsel for Plaintiffs and the Putative Class*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

JASON BURNS and ALLISON BURNS, Individually and On Behalf of All Others Similarly Situated,

Plaintiffs,

vs.

HYUNDAI MOTOR COMPANY, and HYUNDAI MOTOR AMERICA,

Defendants.

Case No. 8:25-cv-02323

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF:**

(1) FALSE ADVERTISING LAW, Cal. Bus. & Prof. Code § 17500, *et seq.*

(2) UNFAIR COMPETITION LAW, Cal. Bus. & Prof. Code § 17200, *et seq.*

(3) SONG-BEVERLY CONSUMER WARRANTY ACT, Cal. Civ. Code § 1790, *et seq.*

(4) CONSUMER LEGAL REMEDIES ACT, Cal. Civ. Code § 1750, *et seq.*

***ACTION SEEKING STATEWIDE OR NATIONWIDE RELIEF***

**JURY TRIAL DEMANDED**

Pursuant to Fed. R. Civ. P. 23, Plaintiffs Jason Burns and Allison Burns bring this class action against Defendants Hyundai Motor Corporation ("HMC") and Hyundai Motor America ("HMA," and collectively with HMC, "Hyundai") on behalf of all persons or entities that purchased or leased a Hyundai vehicle equipped with a 3.3-liter Lambda II GDI engine (the "Class"). Plaintiffs make the following allegations based on personal knowledge as to themselves and their own experiences, and based on the investigation of their counsel as to all other matters. Plaintiffs and their counsel believe that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. INTRODUCTION

1. A car is only as good as its engine. This case arises from Hyundai's longstanding and repeated concealment of a serious, latent defect in many of its vehicles' engines. The specific Hyundai vehicles addressed by this action ("Class Vehicles") include all Hyundai vehicles equipped with a 3.3L Lambda II gasoline direct injection (or "GDI") engine (hereinafter, "Engine").

2. Hyundai is among the largest automobile manufacturers in the United States and the world. Hyundai sells millions of vehicles annually to purchasers and lessees residing in California and throughout the United States. In recent years, at least hundreds of thousands of Class Vehicles have contained fundamentally defective Engines, which tend to fail prematurely and often catastrophically.

3. From at least 2013 through 2019, Defendants manufactured the Engines for Class Vehicles with a dangerous defect that causes abnormal and premature wearing, loosening, and breaking of the Engines' rotating assemblies and internal components ("Engine Defect" or "Defect"). This Defect often results in the sudden and catastrophic failure of Hyundai's Engines.

4. The Engine Defect poses significant safety risks to drivers and passengers. Specifically, the Engines' rotating assemblies tend to prematurely wear and degrade, to

an extent that causes internal components to seize and/or break, causing unusual noises and Engine failures. In many cases, the Engine Defect causes internal components, such as "connecting rods," to violently break and pierce the Engine block, allowing oil and other fluids to leak out, and creating fire and other safety hazards.

5. As detailed herein, Plaintiffs are two of the many purchasers and lessees of Class Vehicles who have experienced: (a) abnormal Engine noises, typically a knocking sound; (b) smoke or fire under their hoods; and (c) sizable holes punched straight through their Engine blocks. To illustrate, below is a photo of Plaintiffs' Engine soon after it catastrophically failed, less than 80,000 miles into its life.



6. Since 2013 or earlier, Hyundai has known or should have known about this Engine Defect. Hyundai knew or should have known about this Defect at all relevant times based on, *inter alia*: (a) customer complaints submitted directly to Hyundai and to the National Highway Traffic Safety Administration ("NHSTA"); (b) information received from various Hyundai dealerships and mechanics; (c) multiple lawsuits and safety recalls involving similar Hyundai engines; and (d) Hyundai's other internal

documents, including but not limited to Technical Service Bulletins (or "TSBs") related to the Engine Defect.

7. Despite Hyundai's longstanding knowledge of this Defect, Hyundai has announced only a series of belated—and incomplete—recalls of selected subsets of the affected vehicles over the past decade. Hyundai's incomplete safety recalls have failed to address the same Engine Defect exhibited by many, *non*-recalled vehicles and engines, including but not limited to the Class Vehicles and Engines at issue in this case.

8. Hyundai has consistently omitted to disclose the Engine Defect to purchasers and lessees of the Class Vehicles at the time of their purchases or lease-signings. Hyundai has even concealed the Defect from purchasers and lessees upon being presented with *broken* vehicles—like Plaintiffs'—which manifested clear symptoms of the Defect. *See* ¶5, *supra*.

9. Hyundai routinely denies warranty claims when the Defect manifests shortly after a warranty period's expiration, despite Hyundai's prior knowledge of the Defect at the time of sale. In fact, Hyundai often declines to provide free Engine repairs or replacements, even when the Defect manifests *within* an express warranty period. Hyundai utilizes an onerous "preapproval" process to disingenuously deny warranty claims, even where the mechanical symptoms presented by Class members plainly match the Engine problems subject to coverage. Defendants conceal the Defect's existence from Class members presenting inoperable vehicles, and typically offer bad faith excuses for denying warranty coverage (*e.g.,* if a Class member cannot produce copies of all maintenance records for a covered vehicle). In sum, Hyundai typically refuses to remedy the Engine Defect, even after it manifests, unless customers pay exorbitant repair or replacement costs.

10. In Plaintiffs' case, they presented Hyundai and its authorized dealership with their inoperable Class Vehicle and Engine (depicted in ¶5, *supra*) and requested proper warranty coverage from July 2024 until October 2024. Throughout those three

months, Hyundai and its dealership knew that there was an applicable, written warranty available for Plaintiffs' Engine, for precisely the type of damage that manifested in Plaintiffs' Engine. *See* Ex. A (the "Extended Warranty"). Nevertheless, for six months, Hyundai and its dealership intentionally and fraudulently concealed from Plaintiffs the very existence of the Extended Warranty. Such concealment allowed Hyundai to evade its expensive "Extended Warranty" obligations to Plaintiffs, and allowed the dealership to: (a) purchase Plaintiffs' broken vehicle from them for pennies on the dollar; and (b) sell Plaintiffs' a newer, replacement vehicle on purely false pretenses.

11. Hyundai has generally failed to offer cost-free Engine repairs or replacements to Plaintiffs and the Class. Hyundai has also declined to reimburse Class members' out-of-pocket expenses upon their Engine failures, and declined to compensate Class members for the economic losses of value and use of their Class Vehicles. Additionally, replacement Engines are not readily available, so owners and lessees are frequently left without operable vehicles for lengthy and indefinite time periods, unless they (like Plaintiffs) purchase replacement vehicles out-of-pocket.

12. Despite Hyundai's knowledge of the Engine Defect from customer complaints, NHTSA investigations, prior lawsuits, dealer reports, and other internal records, Hyundai *still* has not recalled the Class Vehicles for this Engine Defect or provided Class members with suitable repairs or replacements for their Engines free of charge, as promised. Nor has Hyundai offered to reimburse those customers who have incurred out-of-pocket expenses, to address the Defect's manifestations in their Class Vehicles.

13. Because of Hyundai's unfair, misleading, deceptive, and fraudulent business practices at all relevant times, Plaintiffs and the Class have suffered significant losses of money and property. Had Plaintiffs and other Class members known about this Engine Defect, they would never have purchased or leased any Class Vehicles, or alternatively, they would have paid substantially less for their Class Vehicles than what

they paid. Plaintiffs' and other Class members' Engine failures have required expensive repairs, car rentals, towing charges, time off from work, and other costs. Furthermore, Plaintiffs and the Class have suffered sharp reductions if not eliminations of the value of their Class Vehicles due to the Engine Defect identified herein, and due to Hyundai's longstanding concealment of the Defect.

14. Plaintiffs request relief from the significant economic injuries that they and the Class have suffered, as a direct result of Hyundai's unlawful conduct.

## II. PARTIES

15. Plaintiffs Jason Burns and Allison Burns are a married couple residing in the State of California, within the County of San Diego. They are co-purchasers and former owners of a 2018 Hyundai Santa Fe SE, one of the many Class Vehicles containing a "3.3L Lambda II GDI" Engine.

16. Defendant Hyundai Motor Company ("HMC") is a South Korean multinational automaker headquartered in Seoul, South Korea. HMC is the parent company of Defendant Hyundai Motor America ("HMA"). At all relevant times, HMC has acted in California and in the United States by itself, and through HMA and its other various entities. HMC, itself and through HMA and its other various entities, is in the business of designing, engineering, testing, validating, manufacturing, marketing, and selling Hyundai branded vehicles in California and throughout the United States.

17. Defendant Hyundai Motor America ("HMA") is an automobile design, manufacturing, distribution, and/or service corporation doing business within California and the United States. HMA designs, develops, manufactures, distributes, markets, sells, leases, warrants, services, and repairs passenger vehicles, including the Class Vehicles. HMA is incorporated and headquartered in California, with its principal place of business at 10550 Talbert Avenue, Fountain Valley, California 92708. HMA is the American sales, marketing, and distribution arm of its parent company, HMC, overseeing sales and other operations throughout the United States. HMA distributes

and sells a complete line of Hyundai vehicles through more than 800 dealerships across the United States. Money received from the purchase or lease of a Hyundai vehicle from a dealership flows from the dealer to HMA and HMC (together, "Hyundai"). Hyundai uses its authorized dealerships to communicate with Plaintiffs and the Class, in addition to communicating directly with Plaintiffs and the Class.

18. HMA engages in continuous and substantial business in California. Defendant HMA, together with HMC, is responsible for the marketing, distribution, service, repair, installation, and decisions regarding the Class Vehicles as they pertain to the Engine Defect that is the subject of this action.

## III. JURISDICTION AND VENUE

19. Subject matter jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), as many Class Members are citizens of States different from any Defendant, Plaintiffs and Class Members are citizens of California while Defendant HMC is a citizen of a foreign state, and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs.

20. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, and Defendants have caused harm to Plaintiffs and other Class Members in this District.

## IV. ADDITIONAL FACTUAL ALLEGATIONS

### A. <u>Relevant Engine Mechanics</u>

21. In 2012, Hyundai began introducing 3.3-liter Lambda II gasoline direct injection ("GDI") Engines into some of its most popular vehicles, including, but not limited to, Hyundai Santa Fe and Santa Fe XL vehicles of model years 2013 through 2019. *See generally* Ex. A.

22. The Engines contain a GDI fuel-delivery system. A GDI system uses fuel pumps to inject gasoline directly into each of the Engine's six cylinders, rather than

injecting gas into an intake manifold connected to the cylinders. Hyundai has said that its GDI Engines' direct routing of gasoline into the cylinders improves efficiency, fuel economy, and power, while also reducing emissions.

23. Each of the Engines' six cylinders contains a cylinder-shaped piston on the inside. When the high-pressure fuel pump sprays gas into the upper part of a cylinder, the gas mixes with air from a nearby intake valve. This fuel-air mixture creates a "gasoline mist" within the upper part of the Engine's cylinder, above the piston. Then, a spark plug ignites the fuel-air mixture, causing a combustion that rapidly expands gases in the upper part of the cylinder, thereby forcing each piston powerfully downward.

24. Attached to the bottom of each piston is a metal piece called a "connecting rod." When combustion in the top of each cylinder forces each piston powerfully downward, it forces each connecting rod downward. As the connecting rods are forced downward, in coordinated rhythms, they cause the "crankshaft" to forcefully and rapidly rotate, which (ultimately) provides significant rotational power to the vehicles' wheels. Connecting rods generally look like the image below.



25. The smaller, circular end of the connecting rod connects with the piston. The larger, circular end connects with the crankshaft. Below is a simplified illustration.



26. The pistons and connecting rods move rapidly and forcefully up and down, in coordinated rhythms, causing the crankshaft to forcefully rotate, thousands of times per minute. Importantly, between the crankshaft's surface and each connecting rod's surface are "connecting rod bearings," which help reduce friction between the connecting rod's surface and the crankshaft's surface.

27. Oil circulation is also critical to reducing friction and supporting the Engines' operability, durability, and safety. While an Engine is operating, oil performs several important functions, such as:

(a) lubricating the pistons, cylinder walls, connecting rod bearings, and other moving parts, thereby reducing friction, wear, and tear on all lubricated parts;

(b) cooling the Engine, by absorbing and carrying away heat from the Engine's fast-moving metal components; and

(c) transporting contaminants away from the Engine and into an oil filter.

28. The oil pump forces and pressurizes oil throughout the Engine. It draws oil from an oil pan beneath the crankshaft; it then forces oil through an oil filter, and

then through various passages inside the Engine, to properly lubricate and reduce friction among all the powerfully moving and rotating Engine components. Oil then returns to the oil pan through small, drainage holes throughout the Engine. It is then recirculated by the oil pump, back through the oil filter, and throughout the Engine's moving parts.

29. It is especially important for the Engines' connecting rod bearings to be properly lubricated with oil; this allows the crankshaft to rotate smoothly while in connection with the larger, circular ends of the metal connecting rods.

**B. <u>Nature of the Defect in Class Vehicles</u>**

30. Hyundai manufactured the Engines with serious Defects that undermined the Class Vehicles' reliability and safety at all relevant times.

31. The GDI fuel-delivery system described above exposes the Engines to significant heat and internal pressure, even more so than other engine types. Consequently, the manufacturing, assembly, and quality control processes for producing and installing these Engines must be especially robust and precise, to eliminate manufacturing errors such as imperfections and impurities affecting the production or assembly of the Engines' metal components.

32. Due to Hyundai's flawed manufacturing and machining processes for its GDI Engines (including but not limited to its 3.3L Lambda II GDI Engines), the quality of workmanship in building these Engines suffered significantly. Many of the Engines' internal parts, such as connecting rod bearings and various other metal components, were *not* manufactured in conformity with their design specifications.

33. When Engine components fail to meet design specifications, they fail to fit together properly, prematurely wear and break down, and are prone to damaging other Engine components that are critical to the Engines' motion. Because the Engines' components frequently failed to meet design specifications, and thus failed to fit together properly, multiple metal components (small and large) have suffered abnormal

and premature wearing and breakdown over time, causing metal debris to erode into the circulating oil and flow throughout the Engines.

34. Metal debris flowing in the oil, throughout these Engines, has also resulted from problems such as: (a) Defendants' failure to properly clean the crankshafts and remove metal debris during manufacturing; and (b) metal debris created from factory machining operations.

35. The pressurized movement of metal debris throughout these Engines, via the oil, causes damage to multiple components (such as connecting rod bearings and connecting rods) in at least two ways: (a) through direct, frictional contact with the Engines' metal parts; and (b) by inhibiting the free and complete flow of oil to the Engines' parts, causing reduced lubrication and thus premature wear.

36. As metal debris circulates through the Engines during normal operation of the Class Vehicles, over time, the connecting rod bearings suffer abnormal wearing, damage, and eventually: fracturing. Once the connecting rod bearings fracture, even *greater* amounts of metal debris erode into the Engines' circulating oil. The oil then becomes so contaminated with metal debris that the oil filter can no longer remove all the debris, while also maintaining the necessary oil-pressure throughout the Engines.

37. Consequently, the Engines' circulating oil becomes even *more* contaminated and *less* effective in lubricating the Engines' powerfully moving components. That causes further damage to the Engines' moving parts, eventually resulting in sudden and catastrophic failures such as Engine seizures, and non-collision fires igniting in the Class Vehicles.

38. Additionally, as the connecting rod bearings wear down and fracture, too much space is created between the connecting rod's larger end, and the rotating crankshaft that runs through that end. This creates a knocking sound in the Engines, as the up-and-down-gyrating connecting rod pounds against the crankshaft.

39. In some cases, damaged and/or fractured connecting rod bearings may cause a connecting rod to punch violently through the Engine block, forming a significant hole in the bottom of the Engine, and allowing oil and/or other Engine fluids to leak out.

40. In addition to connecting rod bearings and connecting rods, circulating metal debris can also damage other critical components, such as the "main cap," which fastens the crankshaft to the Engine. Metal debris may scratch, wear and/or tear other internal parts and create buildup or blockages that damage adjacent systems, like the oil pump or catalytic converter.

41. Furthermore, because of this debris Defect, the Engines in Class Vehicles suffer from restricted and inadequate oil lubrication. Gasoline engines are designed to have oil properly distributed throughout, via small "lubrication channels." When engines operate as designed, the oil pump forces uncontaminated oil freely throughout the engine, and that oil flows back into the oil pan for refiltering and recirculation.

42. In the Class Vehicles, however, lubrication channels often become clogged and restricted, because of the Engine Defect, even under normal operation and proper maintenance. When the lubrication channels clog, oil cannot flow freely from the oil pump to and throughout all the Engines' components, and cannot fully return to the oil pan, creating a condition called "oil starvation." That causes insufficient lubrication and excess friction between fast-moving Engine parts, which causes the premature wearing of those parts, and eventually, sudden and catastrophic Engine failure.

43. At bottom, this Engine Defect poses very serious safety risks to Class Vehicle operators and occupants. The California Department of Motor Vehicles has found that stalled engines pose significant safety risks. As part of its safety curriculum, the Department has provided instructions for responding to engine stalls, to mitigate the resultant risks of injury.

44. NHTSA has taken a similar view of the risks posed by engine failures during operation of a motor vehicle. For example, in 2011, NHTSA recalled certain Chrysler and Dodge vehicles because of engine seizures, caused by the unexpected failures of connecting rod bearings.

45. In sum, Hyundai failed to manufacture its 3.3L Lambda II GDI Engines in a manner that would ensure their operability, durability, and safety over time, even under normal maintenance and use conditions.

**C. <u>Hyundai's Longstanding, Undisclosed Knowledge Of The Engine Defect</u>**

46. The Class Vehicles addressed by this case are Hyundai vehicles equipped with 3.3L Lambda II GDI Engines. These Engines, however, are not the only Hyundai GDI engines that have exhibited the same debris Defect over the past decade.

47. At all relevant times, Hyundai knew or should have known that the Class Vehicles suffered—and continue to suffer—from the Engine Defect alleged herein. Hyundai knew or should have known this for many years based upon, *inter alia*: (a) consumer complaints lodged with NHTSA, and NHTSA's corresponding investigations; (b) numerous consumer complaints and warranty claims lodged directly with Hyundai; (c) Technical Service Bulletins ("TSB") and recalls issued by Hyundai itself; and (d) multiple, prior lawsuits addressing this Defect in *many* of Hyundai's GDI engines: including, but not limited to, the Engines at issue here.

***1. Numerous NHTSA Complaints and Investigations Informed Defendants of the Engine Defect***

48. All vehicle manufacturers doing business in the United States, including Hyundai, are required by law to monitor and analyze consumers' complaints to NHTSA regarding their vehicles, to determine whether the manufacturer's vehicles or components should be recalled over safety concerns. For that reason, Hyundai has known about the many complaints submitted to NHTSA regarding its Engines at all relevant times.

49. Quoted in ¶¶50-60, *infra*, are just a few of the many NHTSA complaints that Class members have submitted about Hyundai's Engines over the course of many years. Some portions of the below quotations are underlined for emphasis.

50. **August 25, 2013 – NHTSA ID No. 10537110 – 2013 Hyundai Santa Fe** "I WAS AT A LIGHT, AS I LET GO OF THE BRAKE, I HEARD A LOUD CLANKING SOUND AND THE FRONT OF THE CAR SHOOK AND THE CAR IMMEDIATELY DIED. I TRIED TO RESTART, MADE THE SAME SOUND AND DIED. CALLED ROADSIDE AND HAD VEHICLE TOWED TO DEALERSHIP AFTER AN HOUR AND A HALF BEING STUCK AT A LIGHT/INTERSECTION. <u>I WAS TOLD THE NEXT DAY THAT MY CAR SUFFERED A "CATASTROPHIC ENGINE FAILURE". NO CODES CAME UP. THEY DROPPED THE PAN AND SAID METAL PIECES FELL OUT!</u> I WAS LIVID! I'VE ONLY HAD THE CAR LESS THAN A MONTH, ONLY ABOUT 1500 MILES AND THE ENGINE WENT OUT! THANK GOD, I JUST DROPPED THE KIDS OFF TO SCHOOL AND THE ROAD WASN'T SO BUSY AS TO CAUSE AN ACCIDENT. I HAD NO WARNINGS FROM STARTING THE CAR, NO MESSAGES FROM BLUE LINK. SERVICE MANAGER AT DEALERSHIP STATES I WOULD NOT HAVE RECEIVED ANY WARNING, BECAUSE IT HAPPENED QUICK WHICH IS WHY IT IS LABELED AS "CATASTROPHIC FAILURE".

51. **March 21, 2025 – NHTSA ID No. 11649784 – 2013 Hyundai Santa Fe** "The engine completely failed while I was driving. This is the second engine failure I've experienced with this vehicle. My first engine blew at 100,000 miles, and despite having a warranty, Hyundai refused to cover it. In a panic, I had to deplete my savings to buy a replacement engine, which only lasted six months before failing again. Hyundai still refuses to cover the second failure. The failed engine may still be available for inspection if needed. I was driving on the highway with both of my children when the engine completely shut off in the middle of the road. This left us stranded in a dangerous

situation with speeding cars all around us. A sudden engine failure at high speeds could have caused a major accident, risking my life, my children's lives, and other drivers' safety. The failure was confirmed by a service center, but Hyundai refuses to take responsibility for the defect or provide coverage under my warranty. The vehicle has been inspected by a service center, but Hyundai has refused to inspect or assist in any way. There were no warning lamps or messages before the engine shut down. The failure was sudden and unexpected, leaving me in a life-threatening situation on the highway."

52. **October 1, 2015 – NHTSA ID No. 10779144 – 2014 Hyundai Santa Fe** "TL* THE CONTACT OWNS A 2014 HYUNDAI SANTA FE. WHILE DRIVING VARIOUS SPEEDS, AN ABNORMAL NOISE WAS HEARD COMING FROM THE FRONT OF THE VEHICLE. THE VEHICLE WAS TAKEN TO A DEALER WHERE IT WAS DIAGNOSED THAT THE ENGINE FAILED AND NEEDED TO BE REPLACED. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE. THE FAILURE MILEAGE WAS APPROXIMATELY 29,000."

53. **May 27, 2022 – NHTSA ID No. 11466331 – 2014 Santa Fe XL** "Bearing wearing that resulted in engine seizing. The vehicle started to make an engine noise without any light bulb on the dash or any signal of damage or oil leak. Due to the increment in noise I opted to stop the vehicle and tow it to the Hyundai dealer. Consumer's vehicle (2014 Santa Fe xl) started to sound bad out of nowhere on December 2021 and decided to stop it and take it to the Hyundai. The vehicle never light any bulb or lack any power, just the noise. Consumer was told by Hyundai engine needed replacement but they won't cover because consumer is the second owner. The vehicle have 97,000 miles and all the oil changes had been made according to the recommended time by the manufacturer. There is a recall due to the same issues for the Santa Fe sport but consumer's wasn't included."

54. **August 8, 2017 – NHTSA ID No. 11013824 – 2015 Hyundai Santa Fe** "ENGINE SEIZED ON THE VEHICLE AFTER 32000 MILES. SERVICE DEPARTMENT CLAIMS THIS IS DUE TO POOR MAINTENANCE DESPITE ADEQUATE OIL CHANGES OCCUR[RING, INCLUDING] THE MOST RECENT 1 DAY PRIOR TO VEHICLE BREAK DOWN. WE HAD DROVE THE VEHICLE LESS THAN 20 MILES FOLLOWING THE OIL CHANGE AND WAS LEAVING FOR A FAMILY VACATION AND WAS LESS THAN A MILE FROM OUR HOUSE WHEN IT BROOKE DOWN ON A CITY STREET WHEN THE BREAKDOWN OCCURRED. AFTER TOWING THE VEHICLE TO A LOCAL DEALERSHIP IT WAS FOUND TO HAVE A SEIZED ENGINE."

55. **June 18, 2019 – NHTSA ID No. 11221051 – 2015 Hyundai Santa Fe** "DRIVING ON THE INTERSTATE THE ENGINE STARTED MAKING A NOISE AND THE CHECK ENGINE LIGHT ILLUMINATED. AT THAT POINT DRIVING IT STRAIGHT HOME THE ENGINE STALLED SEVERAL TIMES, ONCE WHILE MAKING A TURN THROUGH A BUSY INTERSECTION, I WAS LEFT WITH NO POWER. THIS IS SIMILAR TO THE ISSUES I READ INVOLVING SANTA FE ENGINE RECALLS FOR THE 2013, 2014, AND 2017 MODEL YEARS."

56. **May 6, 2019 – NHTSA ID No. 11205772 – 2016 Hyundai Santa Fe** "ENGINE FAILED AT 63,000 MILES WHILE DRIVING ON INTERSTATE. HYUNDAI BLAMES IT ON SLUDGE IN OIL PAN. WITH OUT SERVICE RECEIPTS WILL NOT WARRANTY ENGINE."

57. **June 16, 2016 – NHTSA ID No. 10874600 – 2017 Hyundai Santa Fe** "I BOUGHT THE VEHICLE ON 5/7/16. ON 6/2/16 I WAS DRIVING ON HIGHWAY 395 WHEN I NOTICED SMOKE COMING OUT OF THE ENGINE COMPARTMENT. THE CAR STARTED LOSING POWER AND EVENTUALLY DIED. WHEN I GOT IT PULLED OVER TO THE SIDE OF THE ROAD I NOTICED FLAMES COMING OUT FROM THE FRONT OF THE ENGINE. I GRABBED

WHAT I COULD AND GOT OUT OF THE CAR. WITHIN 5 MIN THE FRONT OF THE CAR WAS ENGULFED IN FLAMES. I HAD APPROXIMATELY 675 MILES ON IT. I HAVE CONTACTED HYUNDAI BUT THEY HAVE NOT RESPONDED TO ME. I ORDERED A COPY OF THE POLICE REPORT BUT HAVE NOT RECEIVED IT YET. I HAVE PICTURES THAT I HAVE ATTACHED. I AM CONCERNED ABOUT THIS HAPPENING TO OTHER PEOPLE. THANKFULLY I DIDN'T HAVE GRANDKIDS IN THE CAR, I'M NOT SURE I WOULD HAVE BEEN ABLE TO GET THEM OUT."

58. **Oct. 18, 2018 – NHTSA ID No. 11141326 – 2017 Hyundai Santa Fe** "I HAD MY CAR FOR 12 MONTHS I BOUGHT BRAN NEW. IT HAS STALED AND TURN OFF ON ME AT LEAST 5 TIMES. THIS IS A SAFETY ISSUE ESPECIALLY ON THE FREEWAY THE CAR LOSES POWER AND STOPS. THAN BEFORE IT STOPS MAKES A KNOCKING NOISE."

59. **March 24, 2019 – NHTSA ID No. 11191162 - 2018 Hyundai Santa Fe** "MY WIFE WAS DRIVING ON NJ PARKWAY IN HEAVY RUSH HOUR TRAFFIC DOING 70 MILES AN HOUR. CAR THEN STUTTERED AND SLOWED DOWN, WITH HER HAVING TO MOVE THREE LANES OVER WHILE TRYING TO GET OVER BRIDGE. HYUNDAI BLUE LINK CAME ON AND TOLD HER TO GET CAR IMMEDIATELY TO THE DEALER. WHEN TAKEN TO DEALER THEY SAID DUE TO THE KNOCK SENSOR UPDATE THE ENGINE WILL NEED TO BE REPLACED AT 27,000 MILES? THIS WAS DONE BY HYUNDAI TWO WEEKS AGO. UPDATE TO YESTERDAY 3/23/19 AND SAME THING HAPPENED TO HER AGAIN GOING TO WORK ON THE NJ PARKWAY. I THEN TOOK THE CAR TO THE DEALER, SAME ISSUES, SAME COMPUTER SCREEN SHOWED IN THE CAR AND WILL BE NEEDING NOW SECOND ENGINE AT 29,000 MILES. TWO BLOWN ENGINES UNDER 30,000 MILES, HYUNDAI

ADMITS THE PROBLEM TO US AND NOT SURE WHY OTHERS ARE HAVING ISSUE."

60. **April 9, 2019 – NHTSA ID No. 11194945 – 2018 Hyundai Santa Fe** "I WAS DRIVING ON THE INTERSTATE AT 70 MPH AND THE ENGINE SUDDENLY SHUT OFF, IT HAS BEEN AT THE HYUNDAI GARAGE IN DUBOIS, PA FOR 3 WEEKS WAITING FOR A NEW ENGINE AND IT IS A NEW VEHICLE WITH ONLY 12.600 MILES?"

***

61. Going as far back as 2010, the NHTSA database suggests that at least hundreds or thousands of owners and lessees have reported similar problems with Hyundai's GDI engines, including but not limited to the Engines that are the subject of this action. Numerous drivers have reported knocking sounds coming from their engines, and serious or catastrophic failures such as stalling, Engine seizures, and non-collision fires. Those reports have included not only Hyundai Santa Fe vehicles, but also Hyundai Sonata, Tuscon, Genesis, and Veloster models.

62. On March 29, 2019, NHTSA opened a preliminary evaluation to assess the scope, frequency, and safety consequences of alleged defects related to non-collision fires in certain of Hyundai's vehicles. *See* https://static.nhtsa.gov/odi/inv/2019/INOA-PE19003-2613.PDF (last visited Aug. 27, 2025).

63. On April 12, 2019. NHTSA sent Hyundai a letter containing detailed information requests about "[n]on-collision fires that originated, may have originated, or were alleged to have originated in the engine compartment[s]" of any "Hyundai vehicles equipped with Theta II, ***Lambda II***, Gamma and Nu engines, manufactured for sale or lease in the United States." *See* https://static.nhtsa.gov/odi/inv/2019/INIM-PE19003-74878.pdf (last visited Aug. 27, 2025) (emphasis added).

64. In a June 2018 petition asking NHTSA to investigate, the non-profit Center for Auto Safety noted that "most, if not all, auto manufacturers occasionally produce

vehicles that catch fire," but that the "number of non-collision related fires" being reported for certain Hyundai vehicles was "excessive." *See generally* https://www.autosafety.org/wp-content/uploads/2018/06/Center-for-Auto-Safety-Kia-Hyundai-Fire-Defect-Petition.pdf (last visited Aug. 26, 2025). The Center for Auto Safety found "enough of a statistical disparity" between certain Hyundai vehicles, and other manufacturers' "similar" vehicles, "to suggest a systemic issue" in relation to Hyundai's vehicles. *Id.*

### *2. Customer Reports and Warranty Claims Submitted Directly to Defendants Alerted Them to the Defect*

65. Hyundai's customer relations department interacts directly with Hyundai-authorized service technicians, to assist in the diagnosis of vehicle issues and identify potentially widespread vehicle problems. Customer relations collects and analyzes extensive field data, including but not limited to repair requests at Hyundai dealerships/service centers, as well as claims-data and technical reports prepared by engineers who review the vehicles for which warranty coverage is requested.

66. Throughout the past decade or more, Hyundai's customer relations team has received many reports of unexpected, GDI-engine failures, specifically related to connecting rod bearings and lubrication channels.

67. Hyundai's warranty department similarly reviews and analyzes warranty claims-data submitted by dealerships and authorized technicians, to identify any defect trends in its vehicles. When a repair is made under warranty and/or when warranty coverage is requested, Hyundai requires that service centers provide it with detailed documentation of: (a) the mechanical problem(s) complained of; (b) the cause of mechanical problems as determined by authorized technicians; and (c) the proposed repair or replacement work that is needed. Authorized service centers must also preserve any broken parts replaced under warranty, in case Hyundai wishes to audit the dealership or to otherwise verify a warranty repair.

68. Hyundai's authorized service centers are diligent in sending Hyundai very detailed, accurate information about all warranty repairs (and repair requests) because Hyundai will not pay the service centers for performing warranted repairs, unless the vehicular problem, cause, and correction are all adequately described and documented.

69. Hyundai knew or should have known about this Defect for the past decade or more, based on the number of engine-failure complaints and warranty claims it received from owners and lessees nationwide, including many complaints and claims specifically regarding connecting rod bearings and lubrication channels.

### *3. Hyundai's Belated, Incomplete Recalls Further Suggest Defendants' Knowledge of the Engine Defect*

70. Since 2015, Hyundai has often reluctantly, belatedly, and only partially recalled hundreds of thousands of vehicles—including, but not limited to, selected Class Vehicles here—exhibiting the same Defect at issue here, yet spanning multiple engine designs, vehicle models, and model years.

71. Several of Hyundai's past recalls share similarities suggesting the presence of a common Defect among various engine types, including but not limited to the Engines at issue here. For example, they generally focus on mitigating the risks of engine stalls and/or fires. They also referenced similar warning signs, such as knocking sounds and "check engine" or "oil pressure" warnings. Multiple past recalls have included updates to vehicles' Knock Sensor Detection Systems ("KSDS") as part of their remedies; this further shows a similarity of engine symptoms that the company sought to address with driver warnings, rather than actual fixes.[1]

---

[1] In or about February 2019, Hyundai sent owners and lessees of three vehicle models, each spanning multiple model years, letters regarding a "Product Improvement Campaign." The letters explained that a Knock Sensor Detection System, a software system, would purportedly be installed in the vehicles' computers to detect engine vibrations, which would indicate the onset of excessive wearing of the engines' connecting rod bearings. This "KSDS" was supposedly designed (however ineffectively) to alert drivers of excessive wearing before it resulted in severe engine damage and/or catastrophic failure. The mere fact that Defendants developed and

72. In certain of Hyundai's prior recalls described below, variations of the concept that oil leaks could result in engine fires significantly understated if not neglected the true source and severity of this Defect: oil leaks and fires occur primarily when *a hole is punched in the engine block* by a broken and rapidly moving connecting rod. Below is a chart-summary of Hyundai's previous, engine-related recalls that evinced the same Defect at issue here: including for a small, incomplete subset of the Class Vehicles addressed by this action.

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

rolled out this software suggests that they understood the underlying engine problems well before bringing the software to market in 2019.

| Recall No. & Date | Vehicles & Engines | Facts of Recall | Vehicle Prod. Dates/Locations |
|---|---|---|---|
| 15V568000 9/10/2015 | 2011–2012 Hyundai Sonata (2.0L and 2.4L Theta II GDI engines) | **Reason:** Risk of stall from "connecting rod wear" caused by "metallic debris may not have been fully removed during manufacturing of the engine crankshaft."<br><br>**Warning signs:** "knocking noise from engine" and [i[llumination of the engine warning lamp."<br><br>**Chronology:** NHTSA raised the issue with Hyundai in June 2015.<br><br>**Remedy:** Engine inspection and, if necessary, replacement; extended warranty for engine short block; and reimbursement for repairs. | Dec. 11, 2009, to Apr. 12, 2012, by Hyundai Motor Manufacturing Alabama. |
| 17V226000 3/31/2017 | 2013–2014 Hyundai Sonata; 2013–2014 Hyundai Santa Fe Sport (2.0L and 2.4L Theta II GDI engines) | **Reason:** Risk of stall and fire from "[m]achining errors during the engine manufacturing process" that "cause premature bearing wear within the engine."<br><br>**Warning signs:** "[k]nocking noise from engine," "[r]educed power and/or hesitation," "[i]llumination of the 'Check Engine' warning lamp," and "[i]llumination of engine oil pressure warning lamp."<br><br>**Chronology:** Hyundai expanded original 15V568000 recall to include these additional vehicles.<br><br>**Remedy:** Engine inspection and, if necessary, replacement; and reimbursement for repairs. | **Santa Fe Sport:** June 28, 2012, to May 31, 2014, by Kia[2] Motor Manufacturing Georgia.<br><br>**Sonata:** Mar. 21, 2012, to May 29, 2014, by Hyundai Motor Manufacturing Alabama |

[2] Hyundai and Kia, though distinct companies, often share common manufacturing facilities and automobile components, including engines.

| Recall No. & Date | Vehicles & Engines | Facts of Recall | Vehicle Prod. Dates/Locations |
|---|---|---|---|
| 17V578000 9/20/2017 | 2017 Hyundai Santa Fe (3.3L V6 Lambda II Engines) | **Reason:** Risk of stalls from engine bearing wear caused by "crankshaft assemblies … produced with surface irregularities in the crankshaft pin."<br><br>**Warning signs:** "[a]bnormal noise from the engine"; "[r]educed motive power and/or hesitation"; and "[i]llumination of the 'Check Engine'…[or] engine oil pressure warning lamp."<br><br>**Chronology:** Hyundai purportedly began investigating in May 2017, after "field report from a 2017 Santa Fe vehicle indicating a 'knocking' noise coming from the engine."<br><br>**(Purported) Remedy:** "The engine crankshaft is covered for 10 years or 100,000 miles under Hyundai's new vehicle limited warranty. As owners of these vehicles would not have incurred expenses for the warranted repair as a result of this condition, no notification regarding reimbursement … is necessary."[3] | Jan. 26, 2017, to Feb. 13, 2017, by Defendant HMC (Republic of Korea) |
| 19V063000 2/5/2019 | 2011–2013 Hyundai Tucson (all types) | **Reason:** Risk of engine stalls and fires due to "engine oil leak which . . . could eventually lead to engine damage."<br><br>**Warning signs:** "[k]nocking noise from engine[,]" "[r]educed power and/or hesitation," and "[c]heck [e]ngine" or "oil pressure" warning lights.<br><br>**Chronology:** NHTSA began investigating in May 2017, following up on related recalls for 2011–2014 Sonata and 2013–2014 Santa Fe Sports.<br><br>**Remedy:** Inspection and possible replacement of the oil pan and/or engine sub-assembly, along with oil pressure switch replacement. Possible reimbursement for prior repairs. | May 1, 2010 to Dec. 31, 2012 by Defendant HMC. |

[3] Only 420 of the many thousands of Class Vehicles at issue herein were covered by this recall, which itself provided no remedies for the Defect, beyond what Hyundai's original warranties required. *See* https://static.nhtsa.gov/odi/rcl/2017/RCLRPT-17V578-1441.PDF (last visited Aug. 27, 2025).

| Recall No. & Date | Vehicles & Engines | Facts of Recall | Vehicle Prod. Dates/Locations |
|---|---|---|---|
| 20V746000 12/1/2020 | 2012 Hyundai Santa Fe, and 2011–2013, 2016 Hyundai Sonata Hybrid (2.4L Theta II MPI and 2.0L Nu GDI engines);<br><br>2015–2016 Hyundai Veloster (1.6L Gamma engines) | **Reason:** Risk of engine stalls and fires due to "premature wear of the connecting rod bearings," because "[t]he engines in the subject vehicles may have been produced with conditions that can cause premature wear[.]"<br><br>**Warning signs:** "Abnormal (knocking) noise from the engine," "[r]educed power and/or hesitation," and "[c]heck [e]ngine" or "oil pressure" warning lights.<br><br>**Chronology:** NHTSA began investigating in March 2019 "to assess the scope, frequency, and potential safety-related consequences of alleged defects relating to non collision vehicle fires."<br><br>**Remedy:** Engine inspection to determine whether there is any bearing damage and updated KSDS software to "continuously monitor[] engine vibrations for unusual patterns potentially indicating an abnormal condition with the engine." Possible reimbursement for some repairs | **Santa Fe:** Jan. 10, 2012, to July 3, 2012, by Hyundai Motor Manufacturing Alabama, and Kia Motor Company in the Republic of Korea.<br><br>**Sonata Hybrid:** June 2, 2010, to Dec. 17, 2013; and Feb. 25, 2015, to Apr. 25, 2016, by Defendant HMC.<br><br>**Veloster:** May 26, 2014, to July 13, 2016, by HMC. |

73. In June 2015, NHTSA contacted Hyundai regarding instances of stalling events in 2011–2012 Hyundai Sonatas. "Hyundai explained that, as of that time, it did not consider the issue to be safety-related . . . ."[4] NHTSA responded by "inform[ing] Hyundai of its concern over the potential for higher speed stalling events." *Id.*

74. In September 2015, because of NHTSA's investigation, Hyundai issued Recall No. 15V568000 for 470,000 vehicles of model years 2011 and 2012, equipped with 2.4L and 2.0L turbo Theta II GDI engines, for a defect described as "premature bearing wear" that could cause "the vehicle[s] [to] stall while in motion." *Id.* at 1.

[4] *See* Part 573 Safety Recall Report Chronology for NHTSA Recall No. 15V568000, Sept. 10, 2015, *available at* https://static.nhtsa.gov/odi/rcl/2015/RCLRPT-15V568-9490.PDF (last visited Aug. 27, 2025), at 2.

75. In its NHTSA filings, Hyundai described the Recall No. 15V568000 defect and manifestation as follows:

> Hyundai has determined that metal debris may have been generated from factory machining operations as part of the manufacturing of the engine crankshaft during the subject production period. As part of the machining processes, the engine crankshaft is cleaned to remove metallic debris. If the debris is not completely removed from the crankshaft's oil passages, it can be forced into the connecting rod oiling passages restricting oil flow to the bearings. Since bearings are cooled by oil flow between the bearing and journal, a reduction in the flow of oil may raise bearing temperatures increasing the potential of premature bearing wear. A worn connecting rod bearing will produce a metallic, cyclic knocking noise from the engine which increases in frequency as the engine rpm increases. A worn connecting rod bearing may also result in illumination of the oil pressure lamp in the instrument cluster. If the vehicle continues to be driven with a worn connecting rod bearing, the bearing can fail, and the vehicle could stall while in motion.

*Id.* at 1.

76. In December 2015, Hyundai issued a Technical Service Bulletin ("TSB") to dealerships about Recall No. 15V568000, and the steps for performing recall procedures. *See* Dec. 2015 Remedy Instructions and TSB, *available at* https://static.nhtsa.gov/odi/rcl/2015/RCRIT-15V568-3933.pdf (last visited Aug. 27, 2025), at 1. The TSB instructed dealerships to conduct "an Engine Noise Inspection to confirm [the engine's] normal operation" and that the sound test would "help indicate if the engine is operating normally or if an excessive connecting rod bearing wear condition in the engine crankcase may be present." *Id.* The TSB went on to describe the consequences if the defect manifested, stating: "[i]f the vehicle continues to be driven with a worn connecting rod bearing, the bearing can fail, and the vehicle could stall while in motion, increasing the risk of a crash." *Id.*

77. Hyundai's December 2015 TSB for Recall No. 15V568000 called for engine replacement only if the vehicle failed the sound test. If the engine passed the sound test, no repair was made to the vehicle's engine or any of its components. Hyundai simply instructed its dealerships to swap out the vehicle's dipstick, and top off the oil. Those instructions left "passing" vehicles and their occupants vulnerable to future developments and manifestations of the Defect and its dangerous consequences.

78. In March 2017, Hyundai issued Recall No. 17V226000 for 572,000 MY 2013–2014 Hyundai Sonata and Santa Fe Sport vehicles equipped with 2.0L and 2.4L Theta II GDI engines for a defect described as "bearing wear" that "may result in engine seizure." *See* Part 573 Safety Recall Report, NHTSA Recall No. 17V226000, Mar. 31, 2017, *available at* https://static.nhtsa.gov/odi/rcl/2017/RCLRPT-17V226-4558.pdf (last visited Aug. 27, 2025), at 1.

79. In its NHTSA filings, Hyundai described the Recall No. 17V226000 defect and manifestation as follows:

> The subject engines may contain residual debris from factory machining operations, potentially restricting oil flow to the main bearings and leading to premature bearing wear. A worn connecting rod bearing will produce a cyclic knocking noise from the engine and may also result in the illumination of the oil pressure lamp in the instrument panel. Over time, the bearing may fail and the vehicle could lose motive power while in motion.

*Id.*

80. In June 2017, Hyundai issued a TSB and Dealer Best Practice Guide to its dealerships addressing problems in Hyundai Sonata and Hyundai Santa Fe Sport vehicles of model years 2013-2014. *See* June 2017 Dealer Best Practice Guide, *available at* https://static.nhtsa.gov/odi/rcl/2017/RCMN-17V226-4739.pdf (last visited Aug. 27, 2025). The documents describe a known Defect identical to the one identified

in the earlier model-year, Hyundai Sonatas, and prescribe the same inadequate procedures for addressing this known Defect.

> The engines in certain 2013–2014 model year Sonata (YF) and Santa Fe Sport (AN) vehicles equipped with 2.4L and 2.0T GDI engines may contain residual debris from factory machining operations, potentially restricting oil flow to the main bearings and leading to premature bearing wear. Over time, a bearing may fail and the vehicle could lose power while in motion. Indications of a worn connecting rod bearing include:
>
> 1. Knocking noise from the engine
> 2. Reduced power and/or hesitation
> 3. Illumination of the "Check Engine" warning lamp
> 4. Illumination of engine oil pressure warning lamp
>
> The service process consists of an inspection and dipstick, oil and oil filter replacement. If the vehicle does not pass the inspection, the dealer will replace the engine.

*Id.*

81. Much like Hyundai's earlier 2011–2012 Sonata recall, its Recall Report for NHTSA Recall No. 17V226000 explained that, "[o]ver time, the bearing may fail and the vehicle could lose motive power while in motion." *See* Part 573 Safety Recall Report for NHTSA Recall No. 17V226000, Mar. 31, 2017, *available at* https://static.nhtsa.gov/odi/rcl/2017/RCLRPT-17V226-4558.pdf (last visited Aug. 27, 2025), at 2. Notably, in its chronology submission for the recall associated with subsequent model year Sonatas (NHTSA No. 17V226000), Hyundai conceded that this later recall partly resulted from Hyundai "continu[ing] to monitor engine-related field data" from the original, 15V568000 recall group, and "noting an increase in claims relating to the subsequent model years." *Id.*

82. In September 2017, Hyundai recalled a tiny subset of Class Vehicles equipped with 3.3-liter Lambda II GDI Engines. Hyundai recalled 420 of its 2017 Santa Fe vehicles, purportedly because "[t]he crankshaft assemblies may have been produced with surface irregularities in the crankshaft pin, causing engine bearing wear." *See* https://static.nhtsa.gov/odi/rcl/2017/RCLRPT-17V578-1441.PDF (last visited Aug. 27, 2025). Hyundai claimed that the issue was limited to just a small set of "Lambda" Engines manufactured at a specific plant in South Korea, during a limited time period, but that assertion was simply untrue. *Id.*

83. On March 29, 2019, NHTSA opened preliminary evaluations into the extraordinarily high incidence of non-collision fires in many Hyundai vehicles spanning multiple models and model years. *See* https://static.nhtsa.gov/odi/inv/2019/INOA-PE19003-2613.PDF (last visited Aug. 27, 2025). Within weeks thereafter, NHTSA tellingly expanded the scope of its investigation to include all Hyundai-manufactured "vehicles equipped with Theta II, ***Lambda II***, Gamma and Nu engines, manufactured for sale or lease in the United States." *See* https://static.nhtsa.gov/odi/inv/2019/INIM-PE19003-74878.pdf (last visited Aug. 27, 2025) (emphasis added).

84. In addition to NHTSA's investigations into non-collision fires in Defendants' vehicles—spanning numerous models, model years, and engine types—the agency opened a so-called "Recall Query" (No. RQ17004) into Hyundai's prior recall of 2011–2014 vehicles with Theta II engines (Recall Nos. 15V-568 and 17V-226). Those Recall Queries, opened in May 2017, questioned both the timeliness and the scope of Defendants' engine recalls, and their compliance with applicable reporting requirements. *See* https://static.nhtsa.gov/odi/inv/2017/INCLA-RQ17004-5689.PDF (last visited Aug. 27, 2025). This resulted in Hyundai paying civil penalties totaling $140 million. *Id.*

85. In December 2020, Hyundai recalled another 128,948 vehicles under Recall No. 20V746000, for the same Engine Defect plaguing *other* Hyundai-

manufactured vehicles. Hyundai's Recall No. 20V746000 included four different models equipped with 2.4-liter Theta II MPI, 2.0-liter Nu GDI, and 1.6-liter Gamma GDI engines, manufactured between June 2010 and July 2016, at plants in both Alabama and South Korea.

86. In sum, Defendants have long attempted to alleviate public and governmental scrutiny of their vehicles' increased incidence of engine failures, by initiating piecemeal recalls of selected models plagued by engines fires. But those recalls fail to adequately address, explain, or remedy the widespread Engine Defect broadly observed across many Hyundai-manufactured vehicles, model years, and engine types over the past decade or more.

87. Defendants' recalls and purported fixes have inexplicably omitted many other vehicles—including Class Vehicles—which contain similarly, defectively manufactured Engines and suffer the same premature and catastrophic failures as previously recalled Hyundai vehicles.

88. Given Defendants' belated issuances of incomplete recalls over time, for the same Defect, and given persistent reports of engine failures across numerous Hyundai models with various engine types, the Defect likely extends beyond the Class Vehicles addressed by this action and by other, private actions in recent years.

### *4. Defendants Knew or Should Have Known About the Engine Defect from Their Pre-Sale Durability Testing*

89. Defendants are highly experienced in the production of consumer vehicles. As experienced manufacturers, Defendants conduct pre-sale durability testing to see whether their vehicles and components, including engines, are free from defects and align with Defendants' specifications.

90. Hyundai has long touted a pre-sale vehicle testing facility that it maintains in California, known as the "Proving Grounds."

> Hyundai Motor Co. Vice Chairman Kim Dong-Jin today joined a select group of VIPs for the grand opening of Hyundai's first U.S. proving ground in California City, Calif. The 4,300-acre, $60-million facility is the test site for next-generation Hyundai and Kia vehicles. The Hyundai-Kia Motors California Proving Ground furthers Hyundai's growing investment in the United States and reaffirms the company's commitment to designing, testing and building Hyundai products in the United States for North American consumers.
>
> ***
>
> "The Hyundai-Kia Motors California Proving Ground will ensure that Hyundai and Kia continue to develop the highest quality vehicles," said Vice Chairman Kim. "Hyundai and Kia are committed to the U.S., and this facility will help us design vehicles that appeal to consumers in this market as well as worldwide."

*Hyundai Celebrates Grand Opening of New $60 Mln U.S. Proving Ground*, Hyundai Motor Am. (Jan. 26, 2005), *available at* https://www.hyundainews.com/en-us/releases/393 (last visited Aug. 28, 2025).

*91.* At the Proving Grounds, Hyundai vehicles go through very extensive, high-intensity field tests, which are intended to simulate up to 100,000 miles and half decade of wear and tear: in a matter of months. This affords Hyundai significant insights into its vehicles' durability and longevity, well before its vehicles ever reach the general public in California or elsewhere in the United States.

92. The Engine Defect is precisely the type of defect that such rigorous pre-sale testing would reveal, as destructive metal debris is *already* present in the Class Vehicles before they are driven, or alternatively, accumulates in the Class Vehicles prematurely as they accrue mileage over time.

93. Indeed, Class Vehicles tested at the Proving Grounds likely showed evidence of the Engine Defect when the Engines were examined after testing, and certainly if any tested vehicles manifested Defect symptoms (like knocking sounds,

stalls, or engine fires) during Hyundai's high-mileage tests, which were intended to simulate up to five years of intense driving. Those symptoms would have been consistent with the NHTSA complaints and safety recalls quoted above, many of which reported symptoms of engine stalling, knocking sounds, total failures, and fires, well before the mileage distances at which Defendants have claimed to test their vehicles.

**D. <u>Defendants Pervasively Marketed And Warranted Their Vehicles As Safe And Reliable, While Concealing Their Knowledge Of The Engine Defect</u>**

94. In the late twentieth century, Hyundai gained notoriety as a maker of inexpensive cars. Offering cheap cars helped Hyundai gain early traction in a highly competitive auto market. At the same time, offering cheap cars created the risk and reality of having Hyundai's cars perceived as lower quality than other, more established brands that offered higher albeit still reasonable prices (*e.g.,* Honda, Toyota, Ford, or General Motors).

95. Since the early 2000s, Hyundai has increasingly aimed to shift that original, lower-quality perception among American consumers, by highlighting the quality and dependability of its vehicles through advertising. One of Defendants' most prominent U.S. marketing campaigns began around 2009, with the launch of the "Hyundai Assurance" campaign. In the midst of the Great Recession, the campaign promised that if customers lost their incomes involuntarily, within a year after buying a new Hyundai, they could return their vehicles free of charge, even if they had negative equity due to financing and depreciation.

96. Hyundai Assurance also promised purchasers "*America's Best Warranty*," which provided 10-year, 100,000-mile powertrain coverage upon the purchase of a new vehicle. At the time, HMA's Acting President and Chief Executive Officer, John Krafcik, touted "Hyundai's industry-leading warranty," which he said, "provided peace of mind to consumers about Hyundai's quality and reliability." Defendants have continuously emphasized their "*America's Best Warranty*" selling point ever since, in

both national and local advertising, and through their authorized dealerships in California and elsewhere. *See, e.g.,* Hyundai Warranty Coverage | America's Best | Hyundai USA (last visited Aug. 30, 2025); America's Best Warranty | Webb Hyundai Highland (last visited Aug. 30, 2025); America's Best Warranty | Allen Turner Hyundai (last visited Aug. 30, 2025); Hyundai America's Best Warranty - World Car Hyundai North (last visited Aug. 30, 2025); *see also Hyundai PDF Sales Brochures*, Auto-Brochures, https://www.auto-brochures.com/hyundai.html (last visited Aug. 30, 2025).

97. From at least 2012 to the Present, Defendants have continuously and pervasively advertised throughout California and the U.S. that their vehicles are safe, dependable, and perform well over time; Defendants have particularly emphasized this through their pervasive advertising of "*America's Best Warranty*." *Id.*

98. Hyundai has long been one of the largest consumer advertising spenders in the U.S., pumping over $100 million in digital, print and national TV ads annually out of its domestic headquarters in Fountain Valley, California—to the consuming public Statewide and nationwide. Defendants have advertised the safety and reliability of their vehicles, as well as "America's Best Warranty," on hundreds of media platforms and outlets. In recent years, this has included a comprehensive digital marketing strategy that utilizes social media, so-called content marketing, and partnerships with media influencers.

99. In addition, Hyundai has increasingly employed sophisticated data analytics as well as artificial intelligence to create more effective marketing campaigns, predicting buyer behaviors and tailoring Hyundai's ad messaging to consumer desires and sentiments. At all relevant times, the above, sophisticated advertising campaigns and messages have emanated and still emanate from HMA's corporate headquarters in Fountain Valley, California.

100. Another of Hyundai's many, significant advertising partnerships has been with FIFA, the international governing body of professional soccer. Since the turn of

the century, Hyundai has been an official sponsor of the FIFA World Cup, which has afforded Hyundai unparalleled exposure through one of the world's most watched sporting events.

101. Yet in all of Hyundai's continuous, sophisticated, and pervasive advertising to Plaintiffs, Class members, and the consuming public about the safety, quality, and dependability of Hyundai's vehicles—including, but not limited to, the "Hyundai Assurance" and "America's Best Warranty" campaigns—Defendants intentionally and misleadingly concealed from Plaintiffs, the Class, and the public that Class Vehicles (and many other Hyundai vehicles) suffered and still suffer from the dangerous Engine Defect identified herein. Hyundai repeatedly marketed its vehicles to Plaintiffs and the Class as safe, reliable, and functional when, in fact, its vehicles were not and are not.

102. Hyundai substantially developed, created, and controlled all advertising, marketing, and point-of-sale materials for the Class Vehicles. Thus, Hyundai could and should have disclosed the Engine Defect to Plaintiffs and Class members before they ever purchased or leased their Class Vehicles.

**E. <u>Defendants' Warranties For The Class Vehicles</u>**

103. At all relevant times, Hyundai issued two relevant warranties with each Class Vehicle: a "New Vehicle Limited Warranty" and a "Powertrain Limited Warranty."

104. Under the New Vehicle Limited Warranty, Hyundai agreed to repair defects within the earlier of 5 years or 60,000 miles.

105. Under the Powertrain Limited Warranty, Hyundai agreed to repair defects affecting various powertrain and Engine components within the earlier of 10 years or 100,000 miles for original owners, and within the earlier of 5 years or 60,000 miles for subsequent owners.

106. According to Hyundai's "2018 Owner's Handbook & Warranty Information" documents (hereinafter, the "Warranty Handbook"), Hyundai's Powertrain Limited Warranty coverage included the following vehicle components, among others.

> **ENGINE**
>
> Cylinder block/head and *all internal parts*, manifolds, timing gears, timing chain, timing cover, gaskets and seals, oil pump, water pump, fly-wheel, oil pan assembly, rocker cove and engine mounts, and turbocharger.

(emphasis added). The Warranty Handbook further stated that, "[f]or subsequent owners, powertrain components are covered under the New Vehicle Limited Warranty for 5 years/60,000 miles, whichever occurs first."

107. Defendants' Warranty Handbook instructed owners and lessees to bring their Class Vehicles to an authorized Hyundai dealership for all warranty repairs.

108. Hyundai provided these warranties, or substantially similar warranties, for all Class Vehicles at all relevant times.

109. Plaintiffs and other Class members have presented, and continue to present their Class Vehicles to authorized Hyundai dealerships with complaints related to the Defect. Yet Defendants have evaded their warranty obligations by, *inter alia*, requiring Class members to produce a Class Vehicle's entire maintenance history and requiring all oil changes to have been completed at a Hyundai dealership, as a condition of making necessary repairs under warranty. For example, consumers have reported Hyundai denying warranty repairs for the Engine Defect where their vehicle maintenance services, including oil changes, were performed by third-party mechanics and service centers.

110. Defendants have known at all relevant times that the Engine Defect may manifest in Class Vehicles, even where owners or lessees have perfectly adhered to Hyundai's maintenance guidelines. Even if consumers produce their vehicle

maintenance histories, Defendants typically: (a) blame the Engine Defect and its manifestations (like knocking sounds, catastrophic engine failures, and non-collision fires) on consumers; (b) refuse to cover necessary repairs to Class Vehicles under warranty; and (c) charge consumers thousands of dollars to repair or replace a broken engine, or purchase a different vehicle altogether.

111. Many Class members presenting their Class Vehicles to Hyundai dealerships within the applicable warranty periods were denied timely repairs, and told that nothing was wrong with their Class Vehicles. Consequently, both during and after expiration of their warranty periods, many Class members have been, and continue to be, forced to pay for costly repairs or vehicle replacements.

112. Moreover, in many instances, consumers must pay for Defendants' diagnoses of the Engine Defect, even though the Class Vehicles are known to be originally manufactured with the Defect; many Class members must also pay out of pocket for the repair or replacement of their Engines, connecting rods, connecting rod bearings, crankshafts, oil pumps, and various other, covered Engine components. Otherwise, Class members have been forced to pay to replace their Class Vehicles entirely.

113. Indeed, this is what happened to Plaintiffs when they presented their inoperable Class Vehicle to Defendants, and sought warranty coverage for clear and obvious symptoms of the Engine Defect.

**F. <u>Plaintiffs' Experience With The Defect, And With "America's Best Warranty"</u>**

114. On or about May 19, 2019, Plaintiffs purchased a 2018 Hyundai Santa Fe SE, a sport utility vehicle equipped with a 3.3-liter Lambda II GDI Engine. The vehicle had 17,350 miles on it, with just one prior owner; Plaintiffs bought it for approximately $25,000 before taxes and fees.

115. Before purchasing their Class Vehicle, Plaintiffs were exposed to Defendants' radio, television, and online advertisements regarding the quality,

reliability, and safety of Hyundai's vehicles, and regarding Hyundai's (purported) backing of its vehicles with "America's Best Warranty." Many such ads induced Plaintiffs to purchase their 2018 Santa Fe vehicle, yet none of those ads ever disclosed that this model and other Hyundai models were manufactured with the latent Engine Defect described herein.

116. If Plaintiffs had known of the Engine Defect's existence at the time of their purchase, then they would not have purchased their Class Vehicle, regardless of whether the Defect had yet manifested in their Class Vehicle at the time of purchase.

117. Point-of-sale documents provided to Plaintiffs to solicit their purchase specifically referenced Hyundai's warranty for up to 5 years or 60,000 miles; this too materially induced Plaintiffs to purchase their 2018 Hyundai Santa Fe. The same documents cited the existence of one open safety recall, regarding the Class Vehicle's steering wheel assembly (NHTSA Recall No. 18V118000), but none of the documents disclosed that Plaintiffs' Class Vehicle ***also*** suffered from a dangerous Engine Defect, which should have been subject to a safety recall—but was not, due to Defendants' multiyear and ongoing concealment of the Engine Defect.

118. Again, if Plaintiffs had known of the Defect's existence at the time of their purchase, then they would never have purchased their Class Vehicle, regardless of whether the Engine Defect had yet manifested in the vehicle at the time of purchase.

***1. Engine Failures Accumulate Over Time, Forcing Hyundai to Proffer an "Extended Warranty" for Class Vehicles***

119. During the months and years after Plaintiffs' purchase, driver complaints to NHTSA regarding Class Vehicles' Engine failures (and other Hyundai engine failures) continued to pile up. One driver, Jasmine Jewell, so persistently and comprehensively complained to Hyundai and to regulators about her Class Vehicle that NHTSA eventually opened an investigation into potential safety defects that would warrant a nationwide recall. *See* Ex. B ("Jewell Petition" or "Petition").

120. On or about February 2, 2024, Ms. Jewell submitted an email Petition to NHTSA, requesting a "Safety Investigation into Hyundai 3.3L V6 Lambda II Engine failures." *Id.* at 1. Ms. Jewell's Petition explained that her 2017 Santa Fe's Engine had exhibited "a knocking sound" and "unexpectedly failed" at approximately 61,431 miles, while she was "traveling at high speeds on the highway." *Id.*

121. The five-page Petition went on to explain how Hyundai's responses to her sudden Engine failure were unacceptable, and evinced the pervasiveness of the Defect that she too experienced in her Class Vehicle.

> My attempts to address this critical issue with Hyundai have been met with significant challenges. *Shockingly, all four Hyundai dealerships in Rhode Island, when contacted, informed me that their lots were full of cars requiring engine replacements*. They expressed an inability to look at my car [for months] if I towed it to them, with one [dealership] even stating that they would only accommodate existing customers.
>
> Upon towing my vehicle to an authorized Hyundai dealer in Massachusetts, 55 miles away . . . , I faced additional challenges. After weeks of waiting, I was provided with a quote for an engine replacement totaling $19,997.12, excluding labor charges. I was told the diagnosis consisted of the technician turning the vehicle on, hearing the knock and then turning it off. This unexpected and exorbitant amount, in addition to the denial of a goodwill warranty, has placed an undue financial strain on me, further emphasizing the urgency of addressing these engine failures at a systemic level.
>
> I am still trying to implore the goodwill of Hyundai to cover the cost of the failed engine. I've proven my maintenance records are within their manufacturer recommendations[,] and at their request of inspection, the valve train of my engine shows clean, reaffirming that I've properly maintained the engine.
>
> The sudden onset of engine knocking, followed by the potential for **complete engine seizure without any**

> **accompanying warning lights or indications, poses an imminent risk to the safety of drivers and passengers.**

*Id.* at 1-2 (bold emphasis in original; italicized emphasis added).

122. The Jewell Petition described safety risks accompanying unexpected Engine failures, such as losses of vehicle control and the potential for automobile accidents and injuries. Those are in addition to the serious risks posed by non-collision Engine fires, which NHTSA undertook to investigate for certain Class Vehicles in April 2019. *See* ¶¶62-63, *supra*.

123. Ms. Jewell's Petition further emphasized the recent, "significant surge in safety complaints" related to similar Hyundai engine failures, including but not limited to multiple, private lawsuits that were initiated regarding her vehicle's Engine, and regarding other GDI engine types manufactured by Defendants. *See* Ex. B. at 2 - 4.

124. On February 8, 2024, NHTSA initiated actions "to evaluate the issue and determine whether to grant or deny the [P]etition" submitted by Ms. Jewell. Ex. C.

125. On May 16, 2024, NHTSA ***denied*** the Jewell Petition, relying largely upon "manufacturer data" (*i.e.,* Hyundai's post-Petition assertions to NHTSA). *See generally* Ex. D. NHTSA also denied Ms. Jewell's Petition because, according to NHTSA: "Hyundai has extended the limited engine warranty for [model year] 2013-2019 Santa Fe vehicles equipped with 3.3L V-shaped Lambda II engines included in the Petition. The updated coverage is 15 years, or 150,000 miles[,] and details are contained in Technical Service Bulletin 24-EM-003H." *Id.* at 2.

126. Hence, in May 2024, Hyundai carefully evaded regulatory scrutiny of the Defect in Class Vehicles, by purporting to extend its original Engine warranties for Class Vehicles to 15 years/150,000 miles. *See generally* Ex. A. Ever since May 2024, however, Defendants have consistently and fraudulently refused to honor the Extended Warranty.

### *2. Plaintiffs' Engine Fails, and Defendants Fraudulently Conceal their Extended Warranty*

127. Eleven days after NHTSA denied Ms. Jewell's Petition based on Hyundai's purported, "Extended Warranty," Plaintiff Jason Burns was driving his and his wife's 2018 Hyundai Santa Fe during a local commute in San Diego. He heard a loud knocking sound coming from under the hood, soon followed by a loud "bang." A massive plume of smoke shot out the back end of Plaintiffs' Class Vehicle, and white smoke rose rapidly from underneath the hood.

128. Plaintiffs' car lost significant power in its forward motion, so Mr. Burns coasted about twenty to thirty yards, while pulling over to the right side of the road.

129. After pulling over, Mr. Burns got out of his car and popped the hood open, but he could not see anything abnormal or out of place, from his vantage point above the Engine compartment. He called his wife, Plaintiff Allison Burns, to tell her what had happened, and the couple agreed to have their vehicle towed from the roadside to Mr. Burns' nearby workplace, for safety's sake while they figured out what to do next.

130. After having their Class Vehicle towed to Mr. Burns' workplace on May 27, 2024, Plaintiffs discovered a sizable hole in the bottom of their Engine block.

//

//

//

//

//

//

//

//

//

//



131. This was clearly an abnormal symptom for any modern, middle-aged passenger vehicle. There were only 79,966 miles on Plaintiffs' Engine, when it catastrophically self-destructed.

132. Thereafter, Plaintiffs embarked on what would be a multi-month journey of requesting and being denied warranty coverage from Hyundai.

133. Mr. Burns began by contacting HMA's corporate representatives. HMA initially responded that Plaintiffs, as second owners of their Class Vehicle, were no longer covered for 10 years or 100,000 miles under "America's Best Warranty." HMA stated (falsely) that Plaintiffs' Engine fell outside of any applicable warranty period, only because Plaintiffs were subsequent owners rather than original owners of their Class Vehicle. In short, HMA stated that Plaintiffs' catastrophic Engine failure would *not* be covered under warranty.

134. Plaintiffs pushed back, however, and after much back and forth, HMA advised Plaintiffs to bring their Class Vehicle to an authorized Hyundai dealership for inspection.

135. On or about July 14, 2024, Plaintiffs had their Santa Fe towed to Pedder Hyundai of Poway ("Dealership"), in the City of Poway, California. The Dealership and its certified Hyundai mechanics inspected Plaintiffs' vehicle, and proceeded to hold it on their Dealership lot for several weeks, which ultimately turned into three *months*.

136. During those months, Plaintiffs continued to press the Dealership and HMA for an Engine repair or replacement under the manufacturer's warranty. Yet the Dealership and Defendants continually denied Plaintiffs any warranty coverage, on the purported ground that Plaintiffs were outside the applicable warranty period for subsequent owners; the Dealership and Defendants continued to maintain this representation to Plaintiffs throughout all of July, August, September, and October 2024.

137. At no point during those months did Defendants or the Dealership disclose their knowledge of the Engine Defect in Class Vehicles or other Hyundai vehicles. At no point during those months did Defendants or the Dealership disclose to Plaintiffs the known existence of Hyundai's Extended Warranty. Instead of disclosing the known Defect and Hyundai's Extended Warranty for Plaintiffs' Class Vehicle, Defendants and the Dealership *repeatedly* told Plaintiffs that their Class Vehicle was no longer under warranty, solely because Plaintiffs were second owners rather than original owners of their Class Vehicle. Defendants' and the Dealership's representations in that regard were false and misleading at all relevant times.

138. From May 2024 through October 2024 and beyond, Defendants and the Dealership knew, materially misrepresented, and declined to disclose to Plaintiffs the following truths:

(a) Plaintiffs' experiences of a knocking sound in their Class Vehicle, followed by Engine seizure, smoke, and a hole in their Engine block, were all symptomatic of the Engine Defect, which Defendants and the Dealership had known about for years;

(b) Hyundai had recently dodged a federal government investigation into the Defect, by telling NHTSA that Plaintiffs' Class Vehicle and Engine symptoms would be covered by Hyundai's Extended Warranty, which expressly applied to "subsequent owners," for up to 15 years or 150,000 miles (*see* Ex. A); and

(c) in August 2024, Hyundai sent a detailed, Technical Service Bulletin ("TSB") No. 24-EM-007H to the Dealership, detailing Hyundai's Extended Warranty, including its applicability to "subsequent owners," and such TSB was immediately "Circulate[d] To" the Dealership's "General Manager, Service Manager, Parts Manager, Warranty Manager, Service Advisors, Technicians," and other Dealership employees. *See generally* Ex. E.

All such facts were known to Hyundai and its authorized Dealership between May 2024 and October 2024, yet Hyundai and the Dealership each independently misrepresented to Plaintiffs throughout those months that Plaintiffs' Engine failure was ***not*** covered by any warranty, solely because Plaintiffs were "subsequent owners."

139. Upon making such false representation to Plaintiffs, Defendants and the Dealership presented Plaintiffs with a false choice: either (a) pay exorbitant costs to replace their Engine (the mass production of which had already been discontinued); or (b) sell their broken Class Vehicle to the Dealership for pennies, and buy another car.

140. Plaintiffs reasonably relied on Hyundai's and its Dealership's misrepresentation to them throughout the second half of 2024. On or about October 14, 2024, in reliance upon Hyundai's and the Dealership's misrepresentations, Plaintiffs agreed to sell their broken Class Vehicle to the Dealership for a small fraction of its pre-failure value, and to buy a *new* vehicle from the Dealership for approximately $30,000.

141. But for Defendants' and its Dealership's misrepresentations and fraudulent concealments of the Extended Warranty, Plaintiffs would not have sold their Class Vehicle to the Dealership for less than its pre-failure value, and would not have

purchased a new vehicle from the Dealership at all: much less for the full, ~$30,000 retail price Plaintiffs paid.

142. It was not until January 2025—months after Defendants defrauded Plaintiffs out of their warranted Engine repairs, and into a new car—that Plaintiffs received notice of Hyundai's clearly applicable Extended Warranty, which Hyundai had used eight months prior to escape NHTSA's investigation. By this time, however, the damage to Plaintiffs was already done. Plaintiffs could no longer claim under the Extended Warranty, as they no longer owned their Class Vehicle, and Plaintiffs had already purchased a new vehicle on false pretenses.

143. Plaintiffs are not alone in their experiences with Defendants' and their authorized dealerships' fraudulent concealments of Hyundai's Extended Warranty during and after May 2024. By way of example only, another Hyundai owner documented their similar experience (in all likelihood, with a different dealership) as recently as July 2025.

144. **July 1, 2025 – NHTSA ID No. 11670443 – 2014 Hyundai Santa Fe**

"I was driving my daughters to school and the vehicle made a loud squeal and a subsequently a continuous clicking noise. I did not have any warning of the vehicle malfunctioning. There was no check engine light, no loss of power, or anything related to an impending failure. Upon this happening I was able to quickly get the vehicle moved as I was in the middle of the road with people around and lucking was not hit as I immediately stopped. I was close to home and was able to get the vehicle back to our home. Upon speaking with a Hyundai dealership they made me aware of a "silent recall" on many motors within the Hyundai [family] due to internal failures. The vehicle was towed to the dealership and inspected and confirmed to have been linked to the engine failure. <u>Hyundai is now stating that due to me being the second owner of the vehicle I am not apt to the extended warranty</u> and there is no notice on any of the public facing

knowledge to any of this information. I have gone through almost 2.5 months of back and forth with Hyundai case managers & the Attorney general."

145. In instances of "abnormal [E]ngine noise or [E]ngine damage," before 15 years or 150,000 miles, the notion that Class members were or are ineligible for Hyundai's original Powertrain Limited Warranty or (purported) Extended Warranty is materially false and misleading—regardless of whether Class members are the original owners or "subsequent owners" of broken Class Vehicles. Ex. A.

146. Hyundai has routinely declined to provide the necessary Engine repairs or replacements at no cost, even where the Engine Defect manifests within the terms of Hyundai's express warranties.

147. Moreover, despite Hyundai's knowledge of the Engine Defect from thousands of customer complaints, information from dealers, NHTSA databases, prior lawsuits, and Defendants' other internal records, Hyundai still has not recalled the Class Vehicles for the dangerous Defect they carry, nor has Hyundai provided Class members with suitable Engine repairs or replacements as promised, free of charge. Nor has Hyundai offered to reimburse Class members who have incurred out-of-pocket expenses to address the Engine Defect in their Class Vehicles.

148. Plaintiffs and the Class therefore seek judicial relief from Defendants' past and ongoing misconduct, as further set forth below.

## CLASS ACTION ALLEGATIONS

149. Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), on behalf of all persons or entities that purchased or leased a Hyundai vehicle equipped with a 3.3-liter Lambda II GDI engine (the "Class").

150. Members of the Class are so numerous that the joinder of all of them is impracticable. Though the precise number of Class members is currently unknown,

Plaintiffs estimate based on publicly available information about Defendants' sales that there are at least tens of thousands of Class members.

151. This action involves common questions of law and fact, which predominate over questions affecting individual Class members and include the following:

(a) whether Defendants engaged in the conduct alleged herein;

(b) whether Defendants designed, advertised, marketed, distributed, leased, sold, or otherwise placed into the stream of commerce the Class Vehicles defined herein;

(c) whether Defendants manufactured and sold Class Vehicles with the Engine Defect described herein;

(d) whether a reasonable consumer would consider the Engine Defect, and its actual and potential consequences, to be material to the decision to buy or lease a Class Vehicle;

(e) whether the Engine Defect constitutes a safety defect;

(f) whether Defendants knew of the Engine Defect but declined to disclose the Defect's existence and extent to purchasers, including Plaintiffs and the Class;

(g) when Defendants first knew of the Defect referenced in Exhibit A hereto, and what, if anything, Defendants did in response to discovering the Defect;

(h) whether Defendants had a duty to disclose to Class Members the Engine Defect and the true nature of the Class Vehicles;

(i) whether Defendants omitted, concealed, or failed to disclose material facts about the Defect and Class Vehicles to Plaintiffs and the Class;

(j) whether Defendants have engaged in a systematic campaign to avoid honoring their original warranty obligations as well as their more recent, Extended Warranty obligations;

(k) whether the Class Vehicles should be subject to a safety recall;

(l) whether Defendants' conduct violated California's Unfair Competition Law, False Advertising Law, Consumer Legal Remedies Act, or Song-Beverly Act, among other laws;

(m) whether Plaintiffs and the Class overpaid for their Class Vehicles;

(n) whether Class members are entitled to damages, restitution, and other monetary relief, and the proper measure thereof; and

(o) whether Class members are entitled to non-monetary equitable relief, including but not limited to injunctive relief.

152. Plaintiffs' claims are typical of the Class's claims because Plaintiffs and each Class member purchased a Class Vehicle having the same Engine type, and were similarly injured by Defendants' wrongful conduct as alleged herein. Plaintiffs' and the Class's claims asserted herein all arise from the same business practices and course of conduct by Defendants, and rely upon the same legal theories to seek relief from their economic injuries.

153. Plaintiffs and their counsel are adequate to represent the Class because their interests do not conflict with the Class's interests. Plaintiffs are members of the Class they seek to represent and have retained counsel competent and experienced in litigating complex class actions. Plaintiffs and their counsel intend to vigorously pursue this action and protect Class members' interests in it.

154. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. No unusual difficulties exist or are likely to arise in the management of this action as a Class action. The damages suffered by individual Class members are relatively small, compared to the burdens and expenses

that would be incurred to individually litigate each Class member's claims against Defendants, rendering it unlikely if not impracticable for Class members to seek individual redress for their injuries from Defendants' conduct. Even if Class members could afford widespread individual litigations, such litigations would create risks of irreconcilable decisions and judgments, while also increasing the litigation costs to all parties and the court system. The Class action procedure here will promote judicial efficiency and ensure the consistent adjudication of similar rights asserted against Defendants by many, similarly situated persons. Class members can be readily identified and notified of this action based upon data contained in Defendants' business records. *See, e.g.,* Ex. A.

155. Additionally, under Fed. R. Civ. P. 23(b)(2), Hyundai has acted and refused to act on grounds generally applicable to the Class, thereby making final injunctive and declarative relief appropriate for the Class as a whole.

## FIRST RIGHT OF ACTION
### Violation of CAL. BUS. & PROF. CODE § 17500, *et seq.* - Untrue, Misleading and Deceptive Advertising

156. Plaintiffs hereby incorporate by reference the allegations contained in all paragraphs of this Complaint, as if fully set forth herein.

157. Plaintiffs bring this claim on behalf of themselves and the nationwide Class against Defendants.

158. California Business & Professions Code § 17500 states: "It is unlawful for any … corporation … with intent directly or indirectly to dispose of real or personal property … to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated … from this state before the public in any state, in any newspaper or other publication, or any advertising device, … or in any other manner or means whatever, including over the Internet, any statement … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

159. Defendants caused to be made or disseminated throughout California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or through the exercise of reasonable care should have been known, to Defendants to be untrue and misleading to consumers, including but not limited to Plaintiffs and the Class.

160. Defendants violated section 17500 because their misrepresentations and omissions as described herein regarding the safety, reliability, and functionality of the Class Vehicles and Defendants' warranties therefor were material, untrue, and misleading, and likely to deceive a reasonable consumer.

161. Plaintiffs and the Class have suffered injuries in fact, including but not limited to losses of money and property, because of Defendants' unlawful and/or deceptive practices. In purchasing or leasing their Class Vehicles, Plaintiffs and the Class reasonably relied upon Defendants' misrepresentations and omissions regarding the safety and reliability of the Class Vehicles. Defendants' representations and omissions were untrue and misleading because the Class Vehicles are distributed with dangerously defective Engines. Had Plaintiffs and the Class known this, they would not have purchased or leased their Class Vehicles or paid as much for such vehicles as they did. Accordingly, Plaintiffs and the Class overpaid for their Class Vehicles, and did not receive the benefit of the bargain.

162. All the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendants' business. Defendants' wrongful conduct is part of a multiyear pattern and generalized course of conduct that is still perpetuated to this day.

163. Plaintiffs, individually and on behalf of the Class, request that this Court enter such orders and judgments as necessary to enjoin Defendants from continuing their unlawful practices, and to restore to the Class all money that Defendants acquired via false or misleading advertising, including by means of restitution and/or restitutionary disgorgement, along with all other relief available in equity.

**SECOND RIGHT OF ACTION**

**Violations of Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.* – Unlawful, Unfair, and Fraudulent Business Acts and Practices**

164. Plaintiffs hereby incorporate by reference the allegations contained in all paragraphs of this Complaint, as if fully set forth herein.

165. Plaintiffs bring this claim on behalf of themselves and the nationwide Class against Defendants.

166. California's Unfair Competition Law ("UCL") prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

167. Defendants have engaged in unfair competition and unfair, unlawful or fraudulent business practices through the conduct, statements, and omissions described herein, and by knowingly and intentionally concealing the Engine Defect in Class Vehicles from Plaintiffs, the Class, and government authorities, along with concealing the risks, costs, and economic damage resulting from the Engine Defect. Defendants should have disclosed this information because they were in a superior position to know the true facts related to the Engine Defect, and Plaintiffs and the Class could not reasonably be expected to learn or discover independently the true facts related to the Engine Defect.

168. The Engine Defect causes premature wearing and catastrophic Engine failures, up to and including sudden Engine seizures and fires, and this constitutes a serious safety issue that triggered Defendants' duty to disclose the Defect to consumers.

169. Defendants' acts and practices have deceived Plaintiffs and are likely to deceive the public. In failing to disclose the Engine Defect and suppressing other material facts from Plaintiffs and the Class, Defendants breached their duties to disclose these facts, violated the UCL, and caused injuries to Plaintiffs and other Class members.

Defendants' omissions and concealments pertained to information that was material to Plaintiffs and the Class, as it would have been to any reasonable consumer.

170. The injuries suffered by Plaintiffs and Class members are not outweighed by any potential, countervailing benefit to consumers or competition from Defendants' conduct, nor are they injuries that Plaintiffs or Class Members should have avoided on their own.

171. Defendants' acts and practices were and remain fraudulent and unfair, as well as unlawful because they violate California Civil Code §§ 1668, 1709, 1710, and 1750, *et seq.*, and California Commercial Code § 2313.

172. Plaintiffs and the Class have suffered injuries in fact, including but not limited to losses of money and property, because of Defendants' unfair, unlawful, and/or fraudulent business practices.

173. As a result of Defendants' unfair, fraudulent, and unlawful acts and practices detailed herein, Plaintiffs, on behalf of themselves and the Class, and as appropriate, on behalf of the general public, seek permanent injunctive relief prohibiting Defendants from continuing such wrongful practices, and such other equitable relief, including full restitution of all payments the Class made for Class Vehicles, and the restitutionary disgorgement of all ill-gotten gains derived from Defendants' wrongful conduct, to the fullest extent permitted by law.

## <u>THIRD RIGHT OF ACTION</u>
## Violations of the Song-Beverly Act, Cal. Civ. Code § 1790, *et seq.* – Breach of Express and Implied Warranties

174. Plaintiffs hereby incorporate by reference the allegations contained in all paragraphs of this Complaint, as if fully set forth herein.

175. Plaintiffs bring this claim on behalf of themselves and the nationwide Class against Defendants.

176. Defendants provided all purchasers and lessees of the Class Vehicles,

including Plaintiffs and the Class, with the express warranties alleged herein, which formed part of the basis of the bargain. Accordingly, Defendants' written warranties are all express warranties under California law.

177. The parts affected by the Engine Defect, including the rotating assembly and Engine block, were manufactured and distributed by Defendants in the Class Vehicles and are covered by the express warranties Defendants provided to all purchasers and lessors of Class Vehicles.

178. Defendants breached their express warranties by selling and leasing Class Vehicles with the Engine Defect, and refusing to honor such warranties by properly providing repairs or replacements at no cost to Plaintiffs and other Class Members during the applicable warranty periods.

179. Plaintiffs notified Defendants of their warranty breaches within a reasonable time, or were not required to do so because affording Defendants a reasonable opportunity to cure such breaches would have been futile. Defendants also knew about the Engine Defect at all relevant times, and yet chose to conceal it and to neglect their warranty obligations.

180. As a direct and proximate cause of Defendants' breach, Plaintiffs and the Class bought and leased Class Vehicles they otherwise would not have, overpaid for their Class Vehicles, did not receive the benefits of their bargain, and suffered diminutions in the value of their Class Vehicles. Plaintiffs and other Class members further incurred and will continue to incur costs related to the diagnoses of, and repairs or replacements for, their Class Vehicles and the Engine Defect therein.

181. Defendants' many attempts to conceal, restrict, disclaim and/or limit their express warranties with respect to Plaintiffs and the Class are unconscionable and unenforceable under the circumstances alleged in this action. Specifically, Defendants' warranty limitations are unenforceable because Defendants knowingly sold a defective product without informing consumers about the Engine Defect.

182. The time limits contained in Defendants' original, express warranty periods were also unconscionable and inadequate to protect Plaintiffs and the Class. Among other things, Plaintiffs and the Class had no meaningful choice in determining such time limitations, the terms of which unreasonably favored Defendants. A gross disparity in formation and bargaining power existed between Defendants and the Class, and Defendants knew or should have known that the Engines were defective at the time of sale, and could fail shortly after expiration of the express warranty period and/or well before the end of the Class Vehicles' useful lives in the absence of the Defect.

183. Plaintiffs and the Class complied with all of their lawful obligations under Defendants' express warranties, or otherwise are excused from performance of such obligations because of Defendants' conduct alleged herein.

184. Additionally, at all relevant times, Defendants were the manufacturers, distributors, warrantors, and sellers of the Class Vehicles. Defendants knew or should have known the specific use for which the Class Vehicles were purchased.

185. Defendants provided Plaintiffs and the Class with an implied warranty that the Class Vehicles, and any parts thereof, were merchantable and fit for the ordinary purposes for which they were sold. The Class Vehicles, however, were and are not fit for their ordinary purpose because, *inter alia*, the Class Vehicles contained an inherent Defect at the time of sale that causes the Class Vehicles to experience premature degradation and catastrophic Engine failure.

186. The Class Vehicles were not and are not fit for the purpose of providing safe and reliable transportation to consumers because of the Engine Defect.

187. Defendants impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, *inter alia*, the following: (a) a warranty that Class Vehicles and Engines manufactured, supplied, distributed, and sold by Defendants were safe and reliable for providing transportation and would not prematurely and catastrophically fail or catch fire; and (b) a warranty that

the Class Vehicles and their Engines would be fit for their intended use of providing safe and reliable transportation.

188. Contrary to all applicable express and implied warranties, the Class Vehicles and their Engines at the time of sale and thereafter were not fit for their ordinary and intended purposes. Instead, the Class Vehicles were and are dangerously defective.

189. Defendants' actions, as described herein, thus breached not only their express, written warranties, but also their implied warranty that Class Vehicles were of merchantable quality and fit for their intended use, in violation of California Civil Code § 1790, *et seq*.

190. Plaintiffs, on behalf of themselves and the Class, seek actual, consequential, and punitive damages, civil penalties, all available equitable relief (including, but not limited to, enjoining Defendants from continuing to unlawfully deny, breach and evade their express warranty obligations to the Class), and the recovery of all litigation costs and expenses, including attorneys' fees.

## FOURTH RIGHT OF ACTION
**Violations of the California Consumer Legal Remedies Act ("CLRA")**
**Cal. Civ. Code § 1750, *et seq.***

191. Plaintiffs hereby incorporate by reference the allegations contained in all paragraphs of this Complaint, as if fully set forth herein.

192. Plaintiffs bring this claim on behalf of themselves and the nationwide Class against Defendants.

193. Defendants are persons as defined in California Civil Code § 1761(c).

194. Plaintiffs and the Class members are consumers as defined in California Civil Code §1761(d).

195. Defendants engaged in unfair and deceptive acts in violation of the CLRA through the practices described herein, and by knowingly and intentionally concealing

the Engine Defect in the Class Vehicles from Plaintiffs and Class members, along with concealing the risks, costs, and monetary damages resulting from the Engine Defect. These acts and practices violate, at a minimum, the following subsections of Cal. Civ. Code § 1750: (a)(5) Representing that goods or services have sponsorships, characteristics, uses, benefits, or quantities which they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have; (a)(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; (a)(9) Advertising goods and services with the intent not to sell them as advertised; and (a)(16) Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

196. Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

197. Defendants knew the Class Vehicles' Engines were defectively manufactured, would fail prematurely, were prone to cause Engine stalling, seizures and fires, and were not suitable for their intended use.

198. Defendants had a duty to Plaintiffs and the Class to disclose the defective nature of the Class Vehicles' Engines because: (a) Defendants were in a superior position to know the true state of facts about the Engine Defect and associated repair costs in the Class Vehicles and their Engines, and the Defect affects a core function of the car; (b) Plaintiffs and the Class could not reasonably have been expected to learn or discover that the Class Vehicles and their Engines had a dangerous safety defect, until after Defendants' partial, written disclosure of the same to Plaintiffs and Class members in January 2025 (*see* Ex. A); (c) Defendants knew that Plaintiffs and the Class could not reasonably have been expected to learn or discover the Engine Defect and the associated repair costs until manifestation of the Engine Defect and Defendants' January 2025

disclosure thereof; (d) Defendants actively concealed the safety Defect and all associated repair costs by asserting to Plaintiffs and Class members that the causes of their Engine problems were the result of Plaintiffs' and Class members' inabilities to maintain proper Engine oil levels, despite Defendants knowing the true repairs needed to correct the Defect.

199. In failing to disclose the Engine Defect and the associated safety risks and repair costs that result from it, Defendants have knowingly and intentionally concealed material facts and breached their duty to disclose.

200. The facts long omitted and not disclosed by Defendants to Plaintiffs and Class members are material in that a reasonable consumer would have considered them important in deciding whether to purchase or lease the Class Vehicles. Had Plaintiffs and the Class known about the defective nature of the Class Vehicles and their Engines, they would not have purchased the Class Vehicles or would have paid far less for them.

201. At this time, Plaintiffs and the Class do not request, demand, or seek damages for Defendants' violations of Cal Civ. Code § 1770(a). Instead, Plaintiffs and the Class reserve any and all rights to amend this complaint and include a request for damages under the CLRA at a later date, after Plaintiffs comply with the pre-claim notice requirements of Cal. Civ. Code § 1782(a). For the time being, Plaintiffs and the Class demand only injunctive relief, restitution, and other *equitable* relief from Defendants' violations of Cal Civ. Code § 1770(a) as alleged herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all Class members, respectfully request that the Court enter judgment in their favor and against the Defendants, as follows:

A. Determining that the instant action may be maintained as a Class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as Class Representatives and the law firm of Harris LLP as Class Counsel;

B. Damages, including actual, compensatory, general, special, incidental, statutory, punitive, and consequential damages, and costs in amounts to be determined at trial;

C. For an award of restitution, and an order for the disgorgement of all of Defendants' ill-gotten gains from the unlawful conduct alleged herein;

D. Awarding Plaintiffs and the Class prejudgment and post-judgment interest, as well as all reasonable attorneys' fees and expenses in this litigation;

E. For an order permanently and publicly enjoining Defendants from continuing to engage in the unlawful acts and practices alleged herein, including but not limited to an order requiring Defendants to recall, repair and/or replace the Class Vehicles; and

F. Awarding all other relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury.

Dated: October 14, 2025

Respectfully submitted,

HARRIS LLP

By: *s/ David J. Harris, Jr.*

David J. Harris, Jr.
Gerilyn R. Harris
501 West Broadway, Suite 800
San Diego, California 92101
Telephone: (619) 213-1102
david@harrisllp.com
gerilyn@harrisllp.com

*Counsel for Plaintiffs and the Putative Class*